IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JACK WILLIAMS,

                Plaintiff,                        OPINION AND ORDER

   v.

                                                       23-cv-738-wmc

TORRIA VAN BUREN,

                Defendant.

---

Plaintiff Jack Williams, who is representing himself, was previously granted leave to proceed with claims for First Amendment retaliation and common law defamation against defendant Torria Van Buren, a Psychologist Supervisor at Waupun Correctional Institution ("Waupun"). (Dkt. #14.)  Specifically, plaintiff contends that Van Buren filed false conduct reports against him in retaliation for his having filed internal complaints against her.  Before the court is defendant's motion for summary judgment (dkt. #31), contending that the conduct reports Van Buren filed were proper or subject to a qualified immunity defense.  Also pending is plaintiff's unopposed motion for leave to file a sur-reply brief (dkt. #51), which will be granted.  For the reasons explained below, however, the court must grant defendant's motion for summary judgment.

UNDISPUTED FACTS[1]

## A. Background

Plaintiff Jack Williams is now a state prisoner at Wisconsin Department of

---

[1] Unless otherwise indicated, the following facts are material and undisputed for purposes of considering defendant's motion for summary judgment.  The court has drawn these facts from the

Correction's ("DOC") Fox Lake Correctional Institution. Beginning in 2016, while Williams was previously incarcerated at Waupun, he had psychological sessions with Psychologist Kristina DeBlanc, Ph.D. Williams also attended a group therapy session while at Waupun called the "Lifer's Group," which Dr. deBlanc co-facilitated. Williams was an active participant in the Lifer's Group, sharing insights from his life and, on occasion, his writings and poems. During the relevant period, defendant Torria Van Buren was a DOC Psychologist Supervisor.

On January 12, 2023, Williams met with Dr. deBlanc for an individual treatment session, during which he shared a poem entitled "they" about the different perceptions between inmates and correctional staff. He also discussed with DeBlanc the possibility of his sharing that poem with the Lifer's Group. At the conclusion of the session, Williams further asked to speak about a few topics that he had written down, tearing out a page from his notebook and handing it face down to Dr. deBlanc, which he asked her to read after he left. That page was entitled "Chance" and read:

> A chance is me telling you about me. A chance is me believing that you'll be intrigued by these words and want to learn more. A chance is allowing yourself to confide in me to take solace in knowing that as compassionate human beings, just one chance could lead to something special between you and I. Although I am no more then a complete stranger to you. I can promise that at the very least this chance will not be wasted!

(Ex. 1010 - Chance (dkt. #35-3).)

Because Dr. deBlanc found this "Chance" communication to be both clinically inappropriate and an improper solicitation in violation of DOC rules, she consulted with

---

parties' proposed findings of fact and responses, as well as the underlying, record evidence, viewing all such evidence in the light most favorable to Williams, as the non-movant.

2

her supervisor, defendant Van Buren.  Later deBlanc issued a conduct report #00301405 (the "January conduct report") to Williams for "soliciting" a DOC employee.  Dr. deBlanc also wrote a separate letter to Williams, explaining that because she found his "Chance" communication to be soliciting in nature, he was issued the conduct report and would be removed from her caseload, assigned to another provider, and removed from the Lifer's Group.  During the processing of the January conduct report, Williams was initially found guilty.  However, after Williams appealed that finding, it was dismissed due to a procedural defect in service (prison staff having served Williams with the conduct report one day too late under DOC rules).

On February 8, 2023, Williams wrote to Dr. deBlanc and the other Lifer's Group co-facilitator, requesting that both his group pass and his file be "restored."  He also wrote a separate letter to "PSU Supervisor," with "hopes that everything [he] lost [following his conduct report] would be 'restored' due to no violation."  Two days later, on February 10, Van Buren responded to Williams, informing him that despite the procedural dismissal of the January conduct report, he would remain assigned to his new psychologist after having solicited Dr. deBlanc.  Van Buren also explained that Williams would not be allowed to rejoin the Lifer's Group because he "actively attempted to solicit deBlanc" and had previously handed deBlanc another letter with "questionable content."  (Dkt. #36-2, at 1.)

### B. Plaintiff Williams' Inmate Complaints

After Van Buren informed Williams that he would not be allowed to rejoin the Lifer's Group and would remain with his new psychological provider, Williams filed four inmate complaints related to the January conduct report and its consequences.

3

### 1. Complaint #2134

Williams filed his first inmate complaint relating to Van Buren, #2134, on February 10, 2023.  (Dkt. #34-4, at 8-10.)  Williams requested an investigation into Van Buren's conduct, alleging he received "threats." Specifically, he noted Van Buren's February 10 letter, which stated in part "I am concerned you are not taking your actions against Dr. deBlanc seriously . . . I am directing you to not have further correspondence with her. If you continue to do so, a conduct report will be issued for stalking."  *Id*.  More generally, Williams argued that (1) his communicating with deBlanc did not meet the definition of stalking and (2) Van Buren was trying to silence him.  Williams also argued that because the Inmate Complaint Review Process ("ICRS") required him to try to resolve the complaint's issue with the other individual first, which in this case was Dr. deBlanc, prohibiting him from contacting her meant he would not be able to satisfy the ICRS's requirements.  Further, Williams argued that Van Buren improperly used the dismissed January conduct report itself in making her decision not to allow him to return to Dr. deBlanc's case load or the Lifer's Group because dismissed reports are not allowed to be considered in "making program assignment, transfer, or release decisions" under Wis Admin. Code § DOC 303.86(4).  Thus, Williams maintained that Van Buren was being unprofessional and making false accusations.

Upon reviewing Williams' complaint, the institution complaint examiner ("ICE") concluded "Van Buren did not threaten Williams."  The reviewing authority ("RA"), Warden Hepp, reviewed the ICE's determination and concluded that complaint #2134 was properly rejected.  (Dkt. #34-4, at 5.)

4

### 2.  Complaint #2522

In complaint #2522 filed on February 20, 2023, Williams requested to be restored to the Lifer's Group for his rehabilitative needs and that his psychological services unit ("PSU") records be restored.  (Dkt. #34-5, at 16-18.)  In support, Williams argued, "Van Buren not tak[ing] this conduct report and the letter dated 1/13/23 out of [his] file/record, using them as the foundation of her reply is . . . personal emphasizing retaliation for the conduct report being dismissed." (Dkt. #34-5, at 18.)

After a series of appeals and determinations, complaint #2522 was routed to the DOC Psychology Director, who found "[t]he decision to remove Mr. Williams from deBlanc's caseload and group was appropriate … based on [his] behavior of violating the boundaries of the therapy relationship and not based on a Conduct Report." (Dkt. #34-5, at 8.)  That decision was affirmed by the Secretary of the Department of Corrections.

### 3.  Complaint #3222

While the Department of Corrections' internal review of his second, related complaint was pending, Williams next filed inmate complaint #3222 on March 4. Williams again requested an investigation to stop Van Buren's "retaliation actions [and] 'restoring' his treatment group." (Dkt. #34-6, at 8.)  Williams stated he was filing this third complaint because he "[did] not want a conduct report for something Van Buren made up." *Id*. at 10.  Williams alleged that Van Buren was "retaliating by removing him from the group" and "enacting her own justice[.]" *Id*.

The ICE summarily rejected complaint #3222 because it was filed more than 14 days after the incident giving rise to it.  (Dkt. # 34-6, at 2.)  The ICE's decision was also affirmed on appeal.

### 4. Complaint #4692

Finally, on April 3, Williams filed inmate complaint #4962, in which he argued that the ICE who reviewed complaint #3222 committed misconduct and requested an investigation.  In particular, Williams accused the ICE who reviewed the complaint of concealing the actions of Van Buren.

A different ICE reviewed this last complaint and rejected it.  The ICE found that complaint #3222 had exhausted the ICRS, and thus, it had been adequately addressed. While Williams also appealed that decision, it, too, was affirmed.[2]

### C. The May Conduct Report

Dr. deBlanc asserts that sometime in March or April, Williams approached her to apologize for the January incident, in response to which she advised Williams to write his new provider if he had any treatment needs.

Despite this direction and Van Buren's earlier February 10 letter that expressly warned Williams not to correspond further with her, Dr. deBlanc further represents that she received another letter from Williams on May 2, 2023 (the "May letter").  In that letter, Williams allegedly wrote to deBlanc regarding their previous conversation, claiming

---

[2] Williams separately requested a corrections complaint examiner ("CCE") to review the ICE's decision, writing in his letter that he was "being retaliated against for using this complaint process[,]" but that request was summarily dismissed for improper procedure.  (Dkt. #7, at 14).

that he was writing to her because she had told him to reach out if he ever needed anything. In contrast, Dr. deBlanc represents that she said no such thing, but rather made clear that she did *not* want him to contact her.

On May 3, Dr. deBlanc informed Van Buren about the contents of the May letter. Van Buren issued conduct report #00320615 (the "May conduct report") to Williams for stalking, disobeying orders, and lying.  (Ex. 1001 - Conduct Report 615 (dkt. #34-2, at 1-2).)  Among other things, the May conduct report states that:  "On the above date and time, Dr deBlanc approached me and informed me . . . Jack Williams . . . had written to her. I believe this to be significant[.]" *Id*. at 1.  May conduct report also detailed the history of interactions between Dr. deBlanc and Williams, accusing Williams of:  deliberately misrepresenting his previous interaction with Dr. deBlanc in his letter; disobeying direct orders not to contact Dr. deBlanc; and stalking based on his pattern of behavior towards Dr. deBlanc.

However, Williams contends that he never wrote the May letter to Dr. deBlanc, which initiated the May conduct report.  Further, defendant Van Buren has been unable to produce that letter in discovery, explaining that she did not have it, nor was a copy contained in Williams' file.  (Def.'s Resp. to Pl.'s Req. for Doc. Production (dkt. #43-8, at 9).)

OPINION

On this record, plaintiff claims that:  actions alleged in the January and May conduct reports issued against him were false; and defendant filed both reports in retaliation for his previous complaints against her.  Plaintiff claims further that these false conduct reports

defamed him.  Defendant has moved for summary judgment on all claims asserted against him, contending that the conduct alleged in the January and May conduct reports was proper or, in the alternative, excused by the defense of qualified immunity.

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Generally, the party seeking summary judgment has the initial burden of showing that there are no genuine, material disputes of fact and judgment must be entered on the undisputed facts as a matter of law.  *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010).  If that initial burden is met, then the non-moving party must show that material, disputed issues of fact exist, which prevent the entry of summary judgment.  *Id.*  Indeed, "[t]he nonmoving party must do more than simply show that there is *some metaphysical doubt* as to the material facts."  *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (emphasis added)).  "The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive a summary judgment motion; there must be evidence on which the jury could reasonably find in favor of the nonmoving party."  *Id*. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087-88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

While pro se litigants are entitled to liberal construction of their pleadings, that "status doesn't alleviate his burden on summary judgment," meaning even an unrepresented plaintiff must come forward with evidence demonstrating a genuine issue of material fact. *Arnett v. Webster*, 658 F.3d 742, 760 (7th Cir. 2011) (citation omitted). Similarly, while the court must view the record "in the light most favorable to the nonmovant and constru[e] all reasonable inferences from the evidence in his favor," *Moore v. Western Ill. Corr. Ctr.*, 89 F.4th 582, 590 (7th Cir. 2023), a nonmovant, represented or not, is only entitled to favorable inferences that are supported by admissible evidence, not those based upon mere "speculation or conjecture." *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## I. First Amendment Retaliation Claims

To begin, "prison officials may not retaliate against a prisoner for exercising a constitutional right[.]" *Jackson v. Raemisch*, 726 F. Supp. 2d 991, 1006 (W.D. Wis. 2010). To establish a First Amendment retaliation claim, however, the plaintiff must at least offer evidence from which a reasonable jury could find that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the [defendant's] decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citing *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)) (internal quotations omitted). As to the latter, a "'motivating factor' amounts to a causal link between the activity and the unlawful retaliation." *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020). If plaintiff has made this initial offer of

evidence, the burden then shifts to the defendant to rebut it by showing that "the harm would have occurred anyway." *Greene v. Doruff*, 660 F.3d 975, 980 (7th Cir. 2011). Finally, "[i]f the defendant carries that burden, the plaintiff must then" offer evidence from which a reasonable jury could find "that the defendant's proffered reasons for the decision were pretextual and that retaliatory animus was the real reason for the decision." *Zellner v. Herrick*, 639 F.3d 371, 379 (7th Cir. 2011) (citing *Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006)). "Pretext is established by evidence that the protected activity was 'most likely' the reason for the adverse action, 'the defendants' justifications have no basis in fact,' 'the justifications were not the real reason for [the adverse action],' or 'the justifications were insufficient to warrant the [adverse action].'" *Schmoeller v. Village of Island Lake*, 324 F. Supp. 3d 983, 989 (N.D. Ill. 2018) (quoting *Vukadinovich v. Bd. of Sch. Trustees of N. Newton Sch. Corp.*, 278 F.3d 693, 699-700 (7th Cir. 2002)). Unfortunately, the plaintiff has failed to offer sufficient evidence to overcome his initial burden of proof, much less rebut what are obviously good, non-pretextual reasons for defendant's conduct.

## A. The January Conduct Report

Plaintiff claims first that defendant retaliated against him for bringing a previous lawsuit against her in filing the January conduct report. He appears to reference *Williams v. Van Buren*, No. 18-CV-1663, 2022 WL 19835789 (E.D. Wis. Sept. 1, 2022) (granting summary judgment for defendant), *aff'd*, No. 22-2918, 2023 WL 3451407 (7th Cir. May 15, 2023), in which plaintiff alleged that defendant was deliberately indifferent to his need to be placed under clinical observation. In response, defendant argues that no reasonable juror would find that the January conduct report was issued because of *defendant's*

10

retaliatory animus, since defendant *did not* issue the January conduct report; instead, she was merely consulted by Dr. deBlanc before *deBlanc* issued it herself. (*See* Ex. 1011 – Jan. 13, 2023 letter from Dr. deBlanc (dkt. #35-4).) Even in the light most favorable to the plaintiff, this makes the defendant's involvement in issuing the January conduct report tenuous at best.

More importantly, plaintiff's poem "Chance," which stated in part that "one chance could lead to something special between you and I," was reasonably construed as a violation of Wisconsin Administrative Code DOC § 303.30, which prohibits "soliciting an employee." Thus, by giving this poem to Dr. deBlanc, who plaintiff does not dispute is a DOC employee, there was a legitimate reason to issue the January conduct report for soliciting in violation of prison rules. Combined with the fact that DeBlanc recognized this *before* she had even contacted defendant, a reasonable jury would have little to no basis to conclude defendant's inferred support for issuance of the January report was motivated by her residual animus for an earlier lawsuit against her.

Regardless, given that defendant did not file the January conduct report and that it was supported by legitimate grounds, no reasonable jury could find that defendant's proffered reason was pretextual in violation of the First Amendment. Accordingly, defendant is entitled to summary judgment on this claim.

## B. The May Conduct Report

Plaintiff next contends that defendant retaliated against him for filing internal complaints about the January conduct report by filing the May conduct report that accused him of disobeying orders, lying, and stalking. Even assuming this were enough for plaintiff

11

to make out a prima facie case, no reasonable jury could find that the proffered reason for the conduct report was pretextual, nor that it was issued because of retaliatory animus.

To begin, defendant proffers a legitimate reason to issue the May conduct report as well: Dr. deBlanc told defendant that she received the May letter and about its contents; defendant knew Dr. deBlanc explicitly desired to have no contact with plaintiff; *and* defendant had previously ordered plaintiff not to contact DeBlanc, otherwise she would issue a conduct report for stalking. Further, at summary judgment, the court is required to afford "significant deference" to a defendant's "non-retaliatory justification" for an adverse action. *Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020).

Plaintiff has not overcome that deference here. Instead, plaintiff argues that he never wrote or sent the May letter (Pl. Resp. Br. (dkt. #40, at 10), noting that defendant was unable to produce a copy of the letter in discovery. Therefore, plaintiff argues that a jury could reasonably infer both Dr. deBlanc *and* defendant must be lying, leading to a further inference that they conspired to issue the May conduct report for illegitimate reasons. However, plaintiff's argument is contradicted by other, undisputed evidence in the record. Specifically, both defendant and DeBlanc assert that DeBlanc received this letter from plaintiff *on May 2* (DeBlanc Decl. (dkt #35, ¶ 30); Van Buren Decl. (dkt. #36, ¶ 26)), *and* the record of plaintiff's disciplinary proceedings for the May conduct report shows that a "Letter dated 5/2/23" *was* admitted at that time as "Approved Evidence." (Ex. 1001-003, Dkt. #34-2, at 3.) Thus, the hearing officer considered defendant's detailed conduct report, along with the letter, finding plaintiff guilty as charged of all three violations. (*Id*. at 1-2.)

Whether plaintiff did or did not send the May letter is of no consequence. The relevant question is not whether defendant came to a *correct* decision about plaintiff's conduct, but rather whether there was a *legitimate* reason for her to pursue the May conduct report. Here, the undisputed facts lead to only one reasonable inference: defendant believed Dr. deBlanc when she reported that plaintiff sent her the May letter, both disobeying defendant's orders *and* again violating Waupun's rules. To the extent plaintiff disputes what Dr. deBlanc shared with defendant or suggests that they entered a conspiracy, he has laid no evidentiary foundation and offers only speculation, which does not entitle him to favorable inferences at summary judgment. *Grant*, 870 F.3d at 568.

Moreover, even if a jury were to fault defendant for trusting Dr. deBlanc's account (and that seems highly unlikely on the undisputed facts here), an official does not violate the Constitution merely by making errors in disciplinary proceedings. *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 272-73 (2016) (an adverse act because of "mistaken belief" does not violate First Amendment); *Williams v. Brown*, No. 17-cv-11-bbc, 2017 WL 782958, at *2 (W.D. Wis. Feb. 28, 2017) (no First Amendment retaliation claim against officer who gave conduct report to prisoner who failed to give officer information about an assault; "even if it is true that [the prisoner] had no information to give and [the officer] believed mistakenly that [the prisoner] was lying, a mistake is not a First Amendment violation").

Finally, plaintiff would make much of defendant's inability to produce a copy of the May letter now, arguing that it fuels his assertion that he never drafted and sent it to Dr. DeBlanc. *See* Def.'s Resp. to Pl.'s Req. for Doc. Production (dkt. #43-8, at 9) (defendant

13

"does not have a letter to deBlanc dated 5/2/23, nor is it contained within Plaintiff's chart.")  Even if open to dispute, however, there is overwhelming evidence that it does, including its contemporaneous reference in the conduct report issued the next day, descriptions by defendant *and* Dr. DeBlanc, and references to it being made an exhibit during administrative proceedings.  Regardless, there is no evidence that plaintiff has evidence to infer *defendant* lacked a sincere belief in the letter's existence, nor has plaintiff overcome the deference required to be shown to her non-retaliatory justification for issuing the May conduct report.  *Holleman*, 951 F.3d at 880.  Because no reasonable jury could conclude that defendant issued the May conduct report without a legitimate purpose, defendant is entitled to summary judgment on this claim as well.

## II.  Qualified Immunity

Alternatively, defendant has asserted the defense of qualified immunity, which protects government officials from liability for damages unless they "violate clearly established statutory or constitutional rights."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Once the defense is raised, *plaintiff* bears the burden of defeating it by showing that: (1) the defendants violated a constitutional right; and (2) the constitutional right was clearly established at the time of the violation.  *Garcia v. Posewitz*, 79 F.4th 874, 778 (7th Cir. 2023).  "If either inquiry is answered in the negative, the defendant official is entitled to summary judgment."  *Pierner-Lytge v. Hobbs*, 60 F.4th 1039, 1044 (7th Cir. 2023) (citation and internal quotation marks omitted).

At a minimum, plaintiff has not offered a case finding clear violation of a constitutional right where a defendant acted on a colorable conflict of interest and breach

14

of the line between psychologist and patient based on a credible third-party reports of misconduct, as in the case of Dr. deBlanc's issuing the January conduct report in response to his writing "Chance," nor against a defendant who issued a follow-up conduct report based on further inappropriate conduct ignoring this line, as is the case with defendant's issuance of the May conduct report in response to Dr. deBlanc's report that plaintiff had sent the May letter to her despite being told to have no further correspondence with deBlanc.  Because plaintiff has failed to demonstrate any constitutional violation, much less violation of a clearly established right on the evidence here, the court will grant defendant's motion for summary judgment for this additional reason as well.

## III. State Law Defamation

Finally, plaintiff was granted leave to proceed on a defamation claim under Wisconsin law, which is only before this court through an exercise of supplemental jurisdiction under 28 U.S.C. § 1367(a).  When a federal court dismisses plaintiff's only federal claim, and plaintiff has not alleged any other basis for the exercise of federal jurisdiction over his remaining state-law claims, district courts are encouraged to relinquish supplemental jurisdiction absent unusual circumstances.  *See Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 352 (7th Cir. 2019).  Since there are no unusual circumstances that would justify retaining jurisdiction, therefore, the court declines to exercise any further jurisdiction over plaintiff's common law defamation claims and will dismiss those claims without prejudice.

Alternatively, defendant argues that plaintiff's state law claims must be dismissed because plaintiff did not comply with the Wisconsin notice-of-claim statute, Wis. Stat.

15

§ 893.82.  Under this statute, a claimant bringing a civil action against a state employee must serve written notice of the claim on Wisconsin's attorney general within 120 days of the event giving rise to the action.  Wis. Stat. § 893.82(3).  That statute also requires strict compliance.  *Riccitelli v. Broekhuizen*, 595 N.W.2d 392, 399, 227 Wis. 2d 100 (1999).  Because it is undisputed that plaintiff did not comply, his state law claims must be dismissed for this additional reason.

ORDER

IT IS ORDERED that:

1) The plaintiff's motion for leave to file a sur-reply brief (dkt. #51) is GRANTED.

2) The defendant's motion for summary judgment (dkt. #31) is GRANTED as to all of plaintiff's First Amendment claims.

3) Plaintiff's state law claims are DISMISSED WITHOUT PREJUDICE as set forth above.

4) The clerk of court is directed to enter judgment consistent with this opinion and close this case.

Entered this 13th day of August, 2026.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge